UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL J. COLE | ) | |
| ARTHUR BELANGER, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil No. 07-82-B-W |
| | ) | |
| MAINE DEPARTMENT OF | ) | |
| CORRECTIONS, et al., | ) | |
| | ) | |
| Defendants | ) | |


**RECOMMENDED DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**
**(Doc. Nos. 81 & 82)**

Michael Cole commenced this suit as a pro se plaintiff challenging the Maine Department

of Corrections' policies concerning prisoner mail and access to publications.  This action is now

going forward on a fourth amended complaint.  Part of the purpose of the fourth amendment to

the complaint was to add an additional plaintiff, Arthur Belanger, because Cole was anticipating

release and there was a concern about mootness.[1]  The pair is now represented by counsel.[2]  Both

sides have moved for summary judgment and have agreed to a joint statement of undisputed

material facts.  Their idea is, rather than a factual dispute between the parties, this is essentially a

contest turning on First Amendment principles in a correctional context that the Court can

resolve on the stipulated statement of facts and arguments.

Count I pertains to materials downloaded from the internet; Count II pertains to clippings

and/or photocopies from periodicals; Count III pertains to commercial catalogs; and  Count IV

---

[1]    See cf. O'Lone v. Estate of Shabazz, 482 U.S. 342, 345 n. 1 (1987).

[2]    (See Doc. Nos. 62 & 64.)

pertains to a return address requirement.[3]  The parties have stipulated pursuant to Federal Rule of

Civil Procedure 41(1)(a), to the dismissal of the plaintiffs' claims for damages as against all

defendants.

For the reasons set forth below, I recommend that the Court dismiss all claims against

Defendants Shanholtzer and Anderson.  I further recommend, as to the remaining defendants,

Martin Magnusson, Jeffrey Merrill, and Robert Costigan, that the Court grant the defendants'

motion for summary judgment on  Count III of the fourth amended complaint pertaining to the

commercial catalog prohibition and Count IV of the fourth amended complaint pertaining to the

return address requirement.  As to the remaining two counts, Count I and Count II, it is my

conclusion that neither side has carried their summary judgment burden and so neither side is

entitled to judgment as a matter of law.

 If the court agrees with this recommendation, and in view of the fact that the plaintiffs

are fortunate to have appointed counsel working on their behalf, an alternative to proceeding to

trial would be for the parties to submit the two remaining counts on a stipulated record, per

Boston Five Cents Savings Bank v. Secretary of Department of Housing and Urban

Development, 768 F.2d 5, 11 -12 (1st Cir. 1985).  If the parties chose to agree to the entry of

judgment on a stipulated record they would need to expand the current record to include

affidavits, deposition testimony, and any other facts of evidentiary quality they want the court to

consider and acknowledge that they are asking the court to make a factual determination.  As the

Boston Five Cents Savings Bank case makes clear, if the parties stipulate a record for decision

the judge can decide any significant issues of material fact in the record rather than resolve those

---

[3]     Count V of the fourth amended complaint pertains to the policies on periodical review and disposal and that
was the subject of a stipulated dismissal (Doc. No. 80) so it is no longer in play.

disputes in the light most favorable to the non-movant.  It seems to me after a thorough review of the case law involving prisoner litigation raising First Amendment concerns involving prison mail policies, courts decide these issues based on fact intensive inquiries.  The parties here have presented a "stipulated" record that consists of Policy 21.2 and sixty paragraphs of "undisputed" facts.  As discussed below, the main problem arises in connection with the policy-justifying "because" language of the stipulations.  The defendants say the stipulation means that the underlying factual assertions are proven; the plaintiffs say the stipulation establishes the reason why the Department adopted the policy.  In the end, I conclude that both parties may be correct, but that, in any event, the ultimate step of accepting the <u>logic</u> (or lack thereof) behind the "because" language requires factfinding on the court's part.  If the logic behind the policy is viewed most favorably to the non-movant (whether that be the plaintiffs or defendants on the cross-motion) there is a genuine issue of material fact.  Thus, neither party can obtain summary judgment.  Conversion of the pleadings to a motion for judgment on a stipulated record would not require extensive additional briefing once the record was agreed upon and the parties consented to allow the court to make the value-laden judgment calls necessary for resolution of this case.

**<u>Discussion</u>**

***Defendants' Request that Defendants Shanholtzer and Anderson be Dismissed***

In their motion for summary judgment, the defendants note that Defendants Shanholtzer and Anderson are the only defendants who could actually deny individual pieces of mail to an inmate and that there is no allegation that they have any input into the promulgation of the polices.  (Defs.' Mot. Summ. J. at 3.)  Heidi Anderson and Nancy Shanholtzer are employees in the mailroom at the MSP.  (JSMF ¶¶ 6&7.)  The defendants' summary judgment motion points

out that these two are sued in their individual capacity and the claims for damages have been

dismissed.  (Defs.' Mot. Summ. J. at 3.)  The plaintiffs do not address this dismissal request in

their response.  It seems appropriate under the circumstances to grant this request.  Nothing in

the factual record suggests that these individuals participated in a particular incident involving

the plaintiffs' mail, see, e.g., Starr v. Coulombe, Civil No. 06-cv-487-SM,  2009 WL 224968, 5 -

6  (D.N.H. Jan. 29, 2009), or that they acted in any way outside the parameters of the policy in a

manner that could have violated one of these two plaintiff's constitutional rights, see, e.g.,

Daniels v. Williams, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause [of the Fourteenth

Amendment] is simply not implicated by a negligent act of an official causing unintended loss of

or injury to life, liberty, or property.").

***Summary Judgment Standard***

As these two motions for summary judgment are submitted on a joint statement of

undisputed material fact, the focus of the summary judgment inquiry is which side "is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Naser Jewelers, Inc. v. City of Concord,

538 F.3d 17, 19 (1st Cir. 2008).

The stipulated facts rely solely on the policies and have no other record support.  In the

normal summary judgment context this would not provide a basis for allowing the court to do a

proper analysis under Federal Rule of Civil Procedure 56 and District of Maine Local Rule 56.

There are many representations made in the statement of facts concerning, for instance, whether

or not there are legitimate institutional reasons, based on experience or expert opinion, for the

First Amendment restrictions.  (See JSMF ¶¶ 29, 36, 38, 60.)  The expectation would normally

be that the parties would have supported their statement of fact with affidavits, deposition

testimony, and/or reports.  Because of the parties' agreement, all this court has before it is the joint statement of facts supported solely by the policy.

I could not find a controlling case that was in an identical posture to this one.  First Amendment prisoner civil actions have been resolved both at the summary judgment stage and after trials of varying length.  Compare, e.g., Beards v. Banks, 548 U.S. 521 (2006) (addressing these legal principles in a summary judgment posture, affirming summary judgment); Mayfield v. Tex. Dep't Criminal Justice, 529 F.3d 599 (5th Cir. 2008) (summary judgment, affirming in part, vacating in part);  Johnson v. Goord, 445 F.3d 532 (2d Cir. 2006) (summary judgment); Jacklovich v. Simmons, 392 F.3d 420, 428 -29 (10th Cir.2004)("Even given the deference paid to corrections officials in these matters, we are reluctant to conclude that as a matter of law the expert's opinions require summary judgment for either party.  To be sure, the expert was vigorously cross-examined, and a trier of fact is free to evaluate the proper weight to be given expert's testimony.  But that is not the function of summary judgment.") (footnote omitted); Street v. Maloney, 991 F2d 786, 1993 WL 125396 (1st Cir. Apr. 23, 1993) (unpublished) (reversing summary judgment) with, e.g., Overton v. Bazetta, 539 U.S. 126 (2003) (trial); Lewis v. Casey, 518 U.S. 343 (1996) (three-month bench trial); Thornburgh v. Abbott, 490 U.S. 401, 403(1989) (district court conducted a  ten-day bench trial); Turner v. Safley, 482 U.S. 78 (1987) (district court conducted a trial); see also  O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987)(two-day hearing on injunctive motions); Procunier v. Martinez, 416 U.S. 396, 398 (1974) ("Pursuant to 28 U.S.C. s 2281 a three-judge United States District Court was convened to hear appellees' request for declaratory and injunctive relief."); Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119 (1977) (three judge panel hearing on injunctive relief request).

I discuss the concerns regarding the summary judgment record (or absence thereof) at greater length below, with particular attention to how this dispute compares to <u>Beards v. Bank</u>, 548 U.S. 521 (2006), a case that addressed a First Amendment challenge to a prison's mail policy for high security inmates at the summary judgment stage. It is a split decision with the plurality opinion and the two dissenting opinions divided as to whether or not there was a sufficient factual dispute to warrant a trial.

***Joint Statement of Uncontested Material Facts***

**The Plaintiffs**

Michael J. Cole is an individual who was incarcerated in the Maine Department of Corrections ("MDOC") and was a prisoner at the Maine State Prison ("MSP") in Warren, Maine. (JSMF ¶ 1.) Arthur Belanger is an individual who is incarcerated in the MDOC and is a prisoner at the MSP in Warren, Maine. (<u>Id.</u> ¶ 2.)

**The Defendants[4]**

Martin Magnusson is the Commissioner of the MDOC. (<u>Id.</u> ¶ 3.) Jeffrey Merrill is the Warden of the MSP. (<u>Id.</u> ¶ 4.) Robert Costigan is the supervisor of the mailroom staff at the MSP. (<u>Id.</u> ¶ 5.)

**The Policies**

Policy Number 21.2, entitled "Prisoner Mail," ("Policy 21.2") sets forth the policy and procedures regarding the inspection of and restrictions upon prisoners' use of the mail at the MSP. (<u>Id.</u> ¶ 8.) Policy Number 21.2 is the only document setting forth policy and procedures for the review of mail. No other documents or summaries are used or referenced by the

---

[4]     The parties have stipulated to the dismissal of defendants Maine Department of Corrections and Douglas Starbird. (Doc. No. 77.)

mailroom staff.  (Id. ¶ 9.)  Pursuant to Policy 21.2, the policy and procedures are set forth "to

prevent the introduction of contraband, ensure the safety of prisoners, staff and others, ensure

security, maintain orderly management of the facility, enforce facility rules, and prevent criminal

activity."  (Id. ¶ 10.)[5]  This policy allows prisoners to receive correspondence written on a word

processor.  (Id. ¶ 11.)  The policy sets forth no limit on the amount of incoming mail a prisoner is

allowed to receive.  (Id. ¶ 12.)  However, the volume of mail a prisoner is allowed to keep in his

cell at any given time is restricted, both to keep down the quantity of burnable, combustible

material and to keep down the amount of time staff have to spend to do a thorough search of the

contents of a cell for contraband.  (Id. ¶ 13.)  The number of photographs each prisoner is

allowed to keep in his cell is likewise restricted.  (Id. ¶ 14.)  The Policy does not limit the amount

of outgoing mail a prisoner is allowed to send, provided the prisoner has sufficient funds to pay

for postage. (Id. ¶ 15.)

Procedure A.16 of Policy 21.2 specifies that, unless prohibited by Procedure E.1, "a

prisoner may receive originals or photocopies of announcements of significant family events,

e.g., birth, graduation, engagement, marriage, or death, the prisoner's health care, educational,

financial, governmental, or similar documents as approved by the Chief Administrative Officer,

or designee, and material that primarily discusses religious, legal (e.g., court cases, statutes,

constitutional provisions, etc.), or political (referendum or election related) subject matter."  (Id.

¶ 16.)  Procedure A.17 of Policy 21.2 specifies that, unless prohibited by Procedure E.1

---

[5]     The "Policy" section of the prisoner mail policy commences with the following paragraph:
        It is important that there be constructive correspondence between prisoners and their families and
        others as a means to maintain ties with the community.  Each facility shall provide prisoners with
        the means to engage in such correspondence.
 (Policy No. 21-2 at 1 (subsection III), Doc. No. 83-2.)

"a prisoner may receive material downloaded from the internet or from computer software that primarily discusses religious, legal (e.g., court cases, statutes, constitutional provisions, etc.), or political (referendum or election related) subject matter."  (<u>Id.</u> ¶ 17.)  Procedure A.18 of Policy 21.2 prohibits prisoners from "receiv[ing] any other original, photocopied or downloaded materials," meaning other than as specified in Procedures A.16 and A.17.  It further provides that "[m]ail or other designated staff shall immediately dispose of any of the prohibited items."  (<u>Id.</u> ¶ 18.)

Through the adoption of Procedure A.18, defendant Magnusson has barred prisoners from receiving through the mail printed internet materials regardless of content, except for the materials within the exceptions set forth in Procedure A.17.  (<u>Id.</u> ¶ 19.)  Through the adoption of Procedure A.18, defendant Magnusson has barred prisoners from receiving through the mail materials that have been clipped and/or copied from newspapers, magazines, and other periodicals regardless of content, except for the materials within the exceptions set forth in Procedure A.16.  (<u>Id.</u> ¶ 20.)

Pursuant to Procedure A.18 of Policy 21.2, MSP mailroom staff dispose of materials downloaded and printed from internet sources that have been mailed to prisoners because they did not primarily discuss religious, political, or legal subject matter**.**  (<u>Id.</u> ¶ 21.)  Pursuant to Procedure A.18 of Policy 21.2, MSP mailroom staff have disposed of materials that have been clipped and/or copied from newspapers, magazines, or other periodicals because they did not primarily discuss religious, political, or legal subject matter and did not fit within the other exceptions set forth in Procedure A.16.  (<u>Id.</u> ¶ 22.)  Pursuant to Procedure A.18 of Policy 21.2, MSP mailroom staff continue to dispose of materials printed from internet sources and materials clipped and/or copied from periodicals that have been mailed to prisoners at MSP because they

8

do not fit within the exceptions set forth in Procedures A.16 and A.17.  (Id. ¶ 23.)  When materials banned by A.18 of Policy 21.2 are received by the mailroom and disposed of per policy, the sender is not notified of their receipt and/or disposal.  (Id. ¶ 24.)  When materials banned by A.18 of Policy 21.2 are received by the mailroom and disposed of per policy, the prisoner is not notified of their receipt and/or disposal unless there is correspondence written on the materials. (Id. ¶ 25.)

Some traditional publications supplement their print editions with additional online-only materials.  There also exist online-only resources such as Web M.D.  (Id. ¶ 26.)  Because of the policy's prohibition on downloaded internet material, a prisoner's family member cannot directly provide medical literature found on the internet to the prisoner.  Prisoners do not have online access and do not have any other means to receive printed internet material barred by Policy 21.2 if such material only exists on the internet, except that such material may be provided to a prisoner by a staff person for a specific purpose, such as a medical staff member providing to the prisoner printed internet material about his medical condition.  (Id. ¶ 27.)  The policy prohibits prisoners from receiving materials downloaded from the internet through the mail (with the exceptions set forth in Procedure A.17) because prior to the ban the prisons had been receiving increasingly large amounts of materials downloaded from the internet due to the ease of printing off hundreds of pages.  It would have taken staff a great deal of time to screen the materials to determine whether or not they contained prohibited information, including such things as instructions on how to circumvent security devices and  how to make weapons.  Additionally, without reading each page, it would not have been possible to determine if otherwise innocent appearing materials had been altered by imbedding prohibited information.  The MDOC considers that correspondence is less likely to contain prohibited information because the writer

would be unable to claim the prohibited information was included "by mistake."  Since the ban, the mailroom staff have been able to screen the much smaller amounts of downloaded materials sent in, most of which consists of materials discussing religious subject matter.  (Id. ¶ 29.)[6]

The MSP maintains a list of periodicals that are allowed to be subscribed to by prisoners without review.  (Id. ¶ 30.)  Every periodical that is not on this list but which is subscribed to by prisoners is subject to the "media review" process and is reviewed by non-mailroom staff to determine whether or not it contains any picture or article that does not meet the guidelines of Procedure E.1. of Policy 21.2.  (Id. ¶ 31.)  If there are no prohibited pictures or articles, then all the copies of that issue of the periodical are delivered to the prisoners.  If there is prohibited content, all copies of that issue of the periodical are disposed of and the prisoners are so notified. (Policy 21.2, Procedure E.3) (Id. ¶ 32.)  Also pursuant to Procedure E.1., a periodical must be sent from a publisher or a commercial distributor.  If it is received from other than a publisher or commercial distributor, it is disposed of and the prisoner is so notified.  (Id. ¶ 33.)  If a prisoner does not agree with any decision to dispose of a periodical, he may file a grievance.  If the grievance is upheld, as has happened, he is provided the money to order another copy.  The MSP does not have the storage space to hold onto all banned periodicals while waiting to see if any grievances are filed.  (Id. ¶ 34.)

The MSP library subscribes to all the major newspapers in Maine, as well as various magazines.  If the prison does not subscribe to a particular periodical for its library, the only ways a prisoner would be able to access an article in that periodical would be for him to subscribe to the periodical himself or to request the prison library to obtain a copy of the

---

[6]     There is no record citation for this paragraph – I assume that they are relying on the selected pages from the Merrill deposition.

periodical through the inter-library loan process.  There is no way for a prisoner to receive such

an article through the mail from a family member (with the exceptions set forth in Procedure

A.16).  (Id. ¶ 35.)  The policy prohibits prisoners from receiving such an article through the mail

(with the exceptions set forth in Procedure A.16) because prior to the ban prisoners had been

attempting to circumvent the "media review" process by having articles not meeting the

guidelines of Procedure E.1. clipped or photocopied and sent in through the mail.  It would have

taken a great deal of staff time to review every article sent in to see if it had prohibited content.

Since the ban, the mailroom staff have been able to screen the much smaller numbers of

clippings and photocopies sent in, most of which consist of announcements of significant family

events.  (Id. ¶ 36) (emphasis added).

Pursuant to Procedure E.4 of Policy 21.2, prisoners are barred from receiving commercial

catalogs that do not primarily discuss religious, legal, or political subject matter.  (Id. ¶ 37.)

The policy prohibits the receipt of such catalogs because prior to the ban almost all prisoners

would subscribe to the many free catalogs available and, as a result, hundreds and hundreds of

pounds of catalogs came in, requiring a great deal of staff time to sort and deliver them.  Then,

when a prisoner was transferred or released, by policy, all mail, including the catalogs, had to be

forwarded for 90 days (assuming that a released prisoner left a forwarding address, which not all

do).  Creating an even greater burden on staff was the inability to get the companies sending the

catalogs to stop doing so after a prisoner's release, to the point that catalogs often came in for

years after a prisoner's release.  Also, many of the catalogs advertised items that prisoners are

not allowed to order.  A selection of catalogs containing items that prisoners may order is

available in the library.  Since the ban, staff has been able to handle the much smaller numbers of

catalogs that are received, most of which are for religious items.  (Id. ¶ 38)(emphasis added).

Pursuant to Procedure C.5 of Policy 21.2, "[a]ny incoming general mail without a verifiable return address (with or without a name) may be opened or may be immediately disposed of without being opened." (Id. ¶ 39.) The mailroom staff only reviews envelopes to determine whether they include a name and a return address. Unless there is something obvious, like obscenities in the address, they do not make any determination as to whether a return address is verifiable. (Id. ¶ 40.) If mail without a return address appears to involve something alarming like a substance that could be anthrax or a drug, emergency procedures are followed. If there is reasonable suspicion, as set out in Procedure A.13 of Policy 21.2, the mail is turned over to MSP's correctional investigator. (Id. ¶ 41.) Otherwise, MSP mailroom staff open an envelope without a return address and scan its contents for an address in an attempt to determine where it came from and, if they are able to do so, they return it to that address and so notify the prisoner. (Id. ¶ 42.) If MSP mailroom staff are not able to determine where it came from, they dispose of it and so notify the prisoner (also informing him if the sender's name is on the envelope or its contents). If, however, there is a money order or a check in mail which MSP mailroom staff cannot determine the origin of, they do not dispose of the mail but instead contact the prisoner and return it to where the prisoner tells them it came from. (Id. ¶ 43.) MSP mailroom staff has disposed of and continue to dispose of incoming mail without a verifiable return address as set out above. (Id. ¶ 44.)

The policy has the return address requirement for several reasons. The MDOC considers it well known that mail without a verifiable return address is more likely to contain substances and/or information that jeopardize safety, security, and orderly management, such as anthrax, drugs, and information related to criminal activity. Also, prisoners are frequently transferred or released, and the return address enables mail, including mail with money in it, to be returned

after the 90 day mail forwarding requirement has been met.  It is also a means of trying to verify

who is communicating with prisoners.  (Procedures A.1, A.4, A.5, A.6, and A.7 describe

prohibited correspondents.)  There have been cases where because someone put his or her return

address on mail, the person has been able to be charged with a crime by the MSP correctional

investigator.  (Id. ¶ 45.)

### Staffing related to Mail

There are approximately 900 prisoners incarcerated at the MSP at any one time.  (Id. ¶

46.)  The MSP mailroom is staffed by two employees, who each have the same responsibilities.

They work from 7:30 a.m. to 4:00 p.m. Monday through Friday.  From 7:30 until the incoming

prisoner mail comes in, they primarily work on updating the list of prisoners to take account of

transfers, releases, and housing changes within the facility.  (Id. ¶ 47.)  The incoming prisoner

mail arrives at MSP around 9:00 a.m. every day.  The mailroom staff works from approximately

9:00 a.m. until approximately 1:30 p.m. sorting, numbering (addressing the mail with the

prisoner's housing unit), opening, searching, and otherwise processing prisoner mail for

distribution to the MSP prisoners.  Any money orders or checks are logged and sent to the

business office.  (Id. ¶ 48.)  On days when there is a higher volume of mail, such as on

Mondays, when the Saturday mail also has to be processed, or on holidays, the mailroom staff is

still able to complete its processing of the incoming prisoner mail (except for "problem mail") by

approximately 1:30 p.m., sometimes using the help of other staff to do so.  (Id. ¶ 49.)  After the

incoming prisoner mail is processed, the MSP mailroom staff take lunch.  After that, they

perform other of their responsibilities, such as dealing with the "problem mail" (primarily mail

for prisoners who have been transferred or released); processing outgoing prisoner mail;

processing mail coming in for staff; sorting internal mail from staff for prisoners; making notifications as required by the mail policy; and answering grievances. (Id. ¶ 50.)

Over the past seven years, dating back to 2001, the mailroom staff has been able to process all incoming mail within 24 hours of receipt, excluding weekends and holidays. (Id. ¶ 51.) Before physically opening the envelopes of incoming prisoner mail to review the contents for contraband or other content that is not allowed under Policy 21.2, the mailroom staff segregate the legal mail from the general mail and number all incoming mail according to prisoners and the housing units in which they reside and sort the mail by unit. This segregating, numbering, and sorting process is the most time consuming part of the mailroom staff's handling of incoming prisoner mail. (Id. ¶ 52.) Then the mailroom staff opens each envelope of general mail (the legal mail is opened by the housing unit staff in the presence of the prisoner). They pull out the contents and look in the bottom of the envelope for drugs, etc. The mailroom staff review the contents, including every page of correspondence, to, for example, see if there are substances attached. They do not read or scan through the substance of the correspondence. Instead, the mailroom staff look at each page to see if anything stands out as forbidden pursuant to Policy 21.2. If there are other written materials, the mailroom staff look closer to see if it is within the parameters of the policy, e.g., to determine if it really is legal material. (Id. ¶ 53.) If the mailroom staff determines that the sole content of the envelope is a letter, they do not look at its contents unless something jumps out. Mailroom staff have not been designated by the Chief Administrative Officer pursuant to Policy 21.2, Procedure A.10 to read incoming mail and are prohibited from reading the text of the letter pursuant to Policy 21.2. (Id. ¶ 54.)

To determine if an envelope contains material downloaded from the internet, the mailroom staff looks for World Wide Web ("Web") addresses across the top or bottom of the

printed page, advertisements, or blue Web hyperlinks in the text.  (Id. ¶ 55.)  If a letter contains information that is "cut and pasted" from the internet into the body of the letter, it will not be confiscated and will be delivered to a prisoner, unless there is a clear indication that the information has been taken from the internet.  (Id. ¶ 56.)  If the same information that was "cut and pasted" into the body of a letter referenced in Paragraph 56 was, instead, downloaded from the internet and attached to a letter, it would be disposed of by the mailroom.  (Id. ¶ 57.)  In general, personal photographs are permitted to be sent to prisoners, and the mailroom staff does not confiscate personal photographs that are attached to letters sent to the prisoners, unless they are prohibited by Procedure E.1.  (Id. ¶ 58.)  If the mailroom staff identifies any photograph attached to a letter as having been downloaded from the internet, it will dispose of the photograph.  Such a photograph will be confiscated even if it would otherwise have been allowed if it had not been downloaded from the internet.  (Id. ¶ 59.)

**Reason for the 2003 Policy Revisions**

Policy 21.2 was written as part of the transition to the new Maine State Prison.  This policy was written, partially, to cope with the increasing problems set out in paragraphs 29, 36, and 38, which were exacerbated by the quick doubling of the prisoner population in the new Prison compared to the old Prison with no increase in mailroom staff.  On August 4, 2003, when Policy 21.2 first went into effect, the bans on internet downloads, materials clipped and/or photocopied from periodicals, and catalogs were implemented as total bans.  The religious, legal, and political exceptions originated with a challenge to the policy in a Maine court case, and were written into the policy when it was revised on June 21, 2004, even though the Maine case had been dismissed on technical grounds a month earlier.  The MDOC considered that the religious exception would allay concerns arising out of RLUIPA (the Religious Land Use and

Institutionalized Persons Act), the legal exception would ensure that prisoners could be mailed materials relating to their criminal cases, and the political exception reflected the fact that Maine is one of only two states allowing prisoners to vote.  As well, the exception to the clipping and photocopying ban for announcements of significant family events was added due to prisoner expression that these materials were of special importance.  (Id.  ¶ 60.)

### The Legal Analysis

#### The <u>Turner v. Safley</u> Standard

The parties agree that the controlling four-part test for analyzing these First Amendment interests of incarcerated individuals is articulated in Turner v. Safley, 482 U.S. 78 (1987).  In fact, in pressing their motion the defendants rely almost solely on Turner v. Safley, with some reliance on Thornburgh v. Abbott, 490 U.S. 401 (1989).  The plaintiffs wander further afield.

Part one of the Turner v. Safley analysis is that "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89.  (quoting Block v. Rutherford, 468 U.S. 576, 586 (1984)).  The Maine State Prison's policies "cannot be sustained" if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."  Id. at 89-90.  Additionally, the MDOC/MSP objectives must be "legitimate and neutral."  Id. at 90. This Court must inquire whether these prison regulations, which do restrict the inmates' First Amendment rights, "operate[] in a neutral fashion, without regard to the content of the expression."  Id. (citing Pell v. Procunier, 417 U.S. 817, 828 (1973) and Bell v. Wolfish, 441 U.S.520, 551 (1979)).

The "second factor relevant in determining the reasonableness of a prison restriction … is whether there are alternative means of exercising the right that remain open to prison inmates."

16

Id.  If "other avenues" remain available at the prison for the exercise of these four areas of asserted right, the Court "should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.'" Id. (citing see Jones v. North Carolina Prisoners' Union, Inc., 433 U.S. at 131 and quoting Pell v. Procunier, 417 U.S. at 827.).

The third consideration for this Court in analyzing the MDOC/MSP policies, "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id.  MSP is a "closed environment" and "few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." Id.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Id. (citing Jones v. North Carolina Prisoners' Union, Inc., 433 U.S. at 132-33).

The fourth and final Turner v. Safley inquiry addresses whether or not there are ready alternatives to these First Amendment implicated policies.  Id. (citing Block v. Rutherford, 468 U.S. at 587).  "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." Id.  "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Id. at 90-91.  But if the plaintiffs "can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 91.

The Beard v. Banks plurality made it clear, over a dissent on this question by Justice

Thomas, that the Turner v. Safley/Overton v. Bazetta analysis remains the standard applicable to

these types of First Amendment challenges in the correctional setting.  548 U.S. at 528-29.

Overton v. Bazetta is cited by the plurality for the proposition that "courts owe 'substantial

deference to the professional judgment of prison administrators.'"  Beard v. Banks, 548 U.S. at

528 (quoting Overton v. Bazzetta, 539 U.S. at 132).  Overton v. Bazetta emphasized that a court

must ask whether or not "[p]rison administrators had reasonably exercised their judgment as to

the appropriate means of furthering penological goals."  539 U.S. at 133.  "The burden,

moreover, is not on the State to prove the validity of prison regulations but on the prisoner to

disprove it."  Id. (citing Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. at 128 (1977),

O'Lone v. Estate of Shabazz, 482 U.S. at  350, and Shaw v. Murphy, 532 U.S. 223 (2001)).

### *The Implication of __Beard v. Banks__*

 This legal framework is a part of this dispute that the parties agree on.  What is less clear

from the way that this civil rights action has played out in the context of the summary judgment

record is the importance of the procedural posture and state of the record in Beard v. Banks to

the present dispute.  That is, this case presents a very complicated picture of the crossroads of

what is potentially a fact-intensive legal inquiry under Turner v. Safley and the summary

judgment pragmatics of the current dispute in which the parties have attempted to present the

court with a joint statement of facts which stipulates to many representations that would

ordinarily be supported by records/reports, affidavits and/or deposition testimony.

As already highlighted, the only record citations in the joint statement of fact are to the

policy itself.  What is more, there is some disagreement between the parties as to the significance

of this stipulation to the factual statements that go beyond mere description of the contents of the

18

policy.  The defendants take umbrage at the plaintiffs' reliance on deposition excerpts in their

memorandum, arguing that the introduction of this outside evidence runs afoul of the spirit of the

agreement to submit this matter on the stipulated facts supported only by the policy.

In their reply to the defendants' opposition to their motion for summary judgment, the

plaintiffs address the import of the joint statement of facts.  (Pls.' Reply at 3-5.)  They indicate

that by agreeing to the inclusion of certain (key) paragraphs in the joint statement, the plaintiffs

have only agreed that these paragraphs reflect the MDOC's asserted reasons for implementing

the challenged policies.  "Any argument to the contrary," they urge  "would mean that the

Plaintiffs agreed to a Joint Statement that foreclosed them from challenging the facts underlying

the MDOC's reasons for implementing the policy—the entire impetus behind this lawsuit.  This

was not the case and any suggestions otherwise are absurd in the extreme."  (Id. at 4.)  "With

respect to Plaintiffs' citation to certain MDOC deposition testimony," the plaintiffs maintain,

> there is nothing that precludes the Plaintiffs from quoting such testimony from the
> record in their brief. The fact that the testimony does not support the MDOC's
> stated reasons behind the policy does not mean it contradicts the Joint Statement
> of Material Facts. Instead, it demonstrates the conclusory nature of the MDOC's
> proffered reasons supporting the policy. The MDOC was free to cite to other
> deposition testimony to bolster its arguments. The fact that it did not do so and
> instead seeks to exclude such references to its own deposition testimony is telling.

(Id.)

In Beards v. Banks the court also was reviewing a summary judgment record and the

facts were deemed admitted because the plaintiffs did not respond to the correctional defendant's

motion or statement of fact, but filed their own cross motion for summary judgment that did not

place into dispute the facts but argued that the policies were unconstitutional as a matter of law.

With respect to the record, a deputy superintendent at the prison was deposed and "the parties

introduced various prison policy manuals and related documents into the record."  Beard v.

Banks, 548 U.S. at 527.

The District Court granted summary judgment.[7]  A divided panel of the Third Circuit

Court of Appeals concluded that a trial was necessary because the factual basis for the

correctional defendant's policy was insufficient to support summary judgment, see, e.g., Banks v.

Beard, 399 F.3d 134, 141 -142 (3d Cir. 2005) (noting that there were no supporting affidavits by

experts to support the defendant's assertions that the rule achieves or could achieve its stated

rehabilitative purpose, speculating that the District Court relied on the Superintendant's

speculative testimony); id. at 142-43 ("[T]here is no evidence in the record of the misuse of

periodicals or photographs in any of the ways described by the DOC…. Furthermore, there was

no testimony as to the effect such a ban has had on the frequency of fires, be it in the LTSU or

elsewhere."); id. at 144 ("[N]owhere in [Superintendant's] affidavit does he describe specific

incidents where the prohibited materials were used in any manner posing a security risk by

LTSU inmates before or after they were transferred to LTSU."); id. at 145 ("[T]he only

information in the record as to how the process works is the following explanation from

[Superintendant's] deposition:  [']You know, you have the ability through your own actions to be

promoted, if you will, from a level 2 inmate to a level 1 inmate, and we do that every day.  We

have a system where the unit management team reviews each inmate's progress every thirty days.

The unit management team is made up of the unit manager, custody staff, psych staff, nursing

staff.  And we try to give and provide every inmate every opportunity to progress through this

system and to be able to obtain these privileges.['] There are no affidavits in the record from any

---

[7]     The November 15,  2002, recommended decision is not available on the District Court's electronic docket.

of those decision-makers mentioned by [the Superintendant], nor is there any documentation of

the review process."); id. at 147.  ("[T]he District Court's assumption that prisoners would be

more reluctant to use religious materials for such nefarious purposes is unsupported by the

record.").

Nevertheless, the Supreme Court plurality[8] concluded that summary judgment was

appropriate, observing:

> Banks (who was represented by counsel throughout) filed no opposition to
> the Secretary's motion, but instead filed a cross-motion for summary judgment.
> Neither that cross-motion nor any other of Banks' filings sought to place any
> significant fact in dispute, and Banks has never sought a trial to determine the
> validity of the Policy. Rather, Banks claimed in his cross-motion that the
> undisputed facts, including those in [the Superintendant's] deposition, entitled him
> to summary judgment. In this way, and by failing specifically to challenge the
> facts identified in the defendant's statement of undisputed facts, Banks is deemed

---

[8]       The plurality judgment of the court was delivered by Justice Breyer and joined by three others.  Justice
Thomas authored a concurrence joined by Justice Scalia.  Justice Stevens authored a dissent joined by Justice
Ginsburg. Justice Ginsburg authored a solo dissent.
        Then Circuit Court Judge Alito took no part in the Supreme Court's consideration or decision.  He was on
the Third Circuit Banks v. Beard panel and issued a dissent.  In that dissent Judge Alito observed vis-à-vis the
evidentiary burden on the DOC:
        [T]he majority concludes that the regulations are not rationally related to the goal of deterring
        misconduct because "the DOC has offered no evidence that the rule achieves or could achieve its
        stated rehabilitative purpose." Maj. Op. at 141. In taking this approach, the majority misconstrues
        the nature of the first Turner factor. This factor requires us to determine whether there is a "logical
        connection between the regulation and the asserted goal," see 482 U.S. at 89 (emphasis added),
        not whether there is empirical evidence that the regulation in fact serves that goal. The entire
        system of prison discipline might be imperil[]ed if each sanction for prison misconduct could not
        be sustained without empirical evidence that the sanction provided some incremental deterrent.
Banks v. Beard, 399 F.3d at 149.
        With respect to the Alito dissent, the Court of Appeals majority noted:
        Our dissenting colleague contends that we misapply the first Turner factor by requiring the DOC
        to show some evidence to support its contention that the rule achieves or could achieve its stated
        rehabilitative purpose. However, our insistence that the DOC offer some evidence is not, in our
        view, at odds with Turner but rather a complementary part of the analysis in determining whether
        an asserted goal is logically connected to the prison regulation. See Turner, 482 U.S. at 89
        (requiring prison authorities to put forward a legitimate governmental interest justifying the
        regulation). Indeed, in Turner, the Supreme Court evaluated the evidence in determining whether
        the prison rules in question served-in theory or in practice-the alleged penological goals. See id. at
        91-93, 98-99. In our view, the paucity of any such evidence in this matter reinforces the
        conclusion that there is no valid, rational connection between the DOC rule and its stated
        rehabilitative purpose.
399 F.3d at 142 n.10.

to have admitted the validity of the facts contained in the Secretary's statement.

Beard v. Banks, 548 U.S. at 527.  So, even the plurality looked beyond the statement of

undisputed material facts to the deposition of the Superintendant of Corrections and his

articulation of the reasons for the policy.[9]  What is more, the plurality was clear that logic alone

would not win the day for the correctional defendant:

> [W]e do not suggest that the deference owed prison authorities makes it
> impossible for prisoners or others attacking a prison policy like the present one
> ever to succeed or to survive summary judgment. After all, the constitutional
> interest here is an important one. Turner requires prison authorities to show more
> than a formalistic logical connection between a regulation and a penological
> objective. A prisoner may be able to marshal substantial evidence that, given
> the importance of the interest, the Policy is not a reasonable one. Cf. 482 U.S., at
> 97-99 (striking down prison policy prohibiting prisoner marriages). And with or
> without the assistance that public interest law firms or clinics may provide, it is
> not inconceivable that a plaintiff's counsel, through rigorous questioning of
> officials by means of depositions, could demonstrate genuine issues of fact for
> trial. Finally, as in Overton, we agree that "the restriction here is severe," and "if
> faced with evidence that [it were] a de facto permanent ban ... we might well
> reach a different conclusion in a challenge to a particular application of the
> regulation." 539 U.S. at 134. That is not, however, the case before us.
>      Here prison authorities responded adequately through their statement and
> deposition to the allegations in the complaint. And the plaintiff failed to point to
> "'specific facts'" in the record that could "lead a rational trier of fact to find" in his
> favor. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587
> (1986) (quoting Fed. Rule Civ. Proc. 56(e)).

548 U.S. at 535-36 (2006); see id. at 533 ("The upshot is that, if we consider the Secretary's

supporting materials, i.e., the statement and deposition, by themselves, they provide sufficient

justification for the Policy.  That is to say, unless there is more, they bring the Policy within

Turner's legitimating scope."); id. at 534 (observing that plaintiff did not introduce "fact-based or

expert-based refutation in the manner the rules provide").

---

[9]      It is not clear from the plurality's approach that they would have agreed to go so far as Justice Alito's
assertion that the court should examine the logic of a policy under Turner without insisting on empirical evidence.
See supra note 8.

And it cannot be ignored that this plurality was issued in the context of strong dissenting opinions which were troubled by the resolution of the First Amendment disputes at a summary judgment stage of litigation.  See Beard v. Banks, 548 U.S. at 5542-53 (Stevens, J., dissenting, joined by Ginsburg, J.); id. at 553-56 (Ginsburg, J. dissenting).  Justice Ginsburg directed her "separate writing to the plurality's apparent misapprehension of the office of summary judgment."  Id. at 553.  She opined:

> The showing made by the Secretary in support of summary judgment is slim, the kind that could be made to justify virtually any prison regulation that does not involve physical abuse. The Secretary relies on his own statement of undisputed facts and the deposition of the prison's Deputy Superintendent. The deposition states that "obviously we are attempting to do the best we can to modify the inmate's behavior so that eventually he can become a more productive citizen. ... We're very limited ... in what we can and cannot deny or give to an inmate, and [newspapers and photographs] are some of the items that we feel are legitimate as incentives for inmate growth." App. 189, 190. The Secretary's statement of undisputed facts similarly asserts that the regulation "serves to encourage ... progress and discourage backsliding." Id., at 27.
>
> These statements, the plurality holds, are sufficient to show that the challenged regulation is reasonably related to inmate rehabilitation. Ante, at 2579. But prison officials " 'cannot avoid court scrutiny by reflexive, rote assertions.' " Shimer v. Washington, 100 F.3d 506, 510 (C.A.7 1996) (quoting Williams v. Lane, 851 F.2d 867, 886 (C.A.7 1988) (Flaum, J., concurring in result)). See also Turner, 482 U.S., at 98, 107 S.Ct. 2254 (noting lack of evidence offered by prison officials to support a ban on inmate marriages); Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 986 (C.A.8 2004) (applying Turner and concluding that the Corrections Department's "documented reason for censoring [a magazine] is too conclusory to support [summary] judgment in its favor"); Jacklovich v. Simmons, 392 F.3d 420, 428-434 (C.A.10 2004). " '[T]raditional deference does not mean that courts [are to] abdicat[e] their duty to protect those constitutional rights that a prisoner retains.' " 399 F.3d 134, 140 (C.A.3 2005) (quoting Fortner v. Thomas, 983 F.2d 1024, 1029 (C.A.11 1993)
>
> The plurality correctly recognizes that it "must draw 'all justifiable inferences' in Banks'[s] 'favor.' " Ante, at 2578 (quoting Liberty Lobby, 477 U.S., at 255, 106 S.Ct. 2505). It then backtracks, distinguishing "evidence of disputed facts" from "disputed matters of professional judgment," and asserts that "[i]n respect to the latter, our inferences must accord deference to the views of prison authorities." Ante, at 2578 . While Turner deference can and should be incorporated into the evaluation of a motion for summary judgment, that deference should come into play, pretrial,  only after the facts shown are viewed

> in the light most favorable to the nonmoving party and all inferences are drawn in that party's favor. See Liberty Lobby, 477 U.S., at 252-255; cf. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150-51 (2000).
>
>  ….
>
> Turner came to us after a full trial, and the Court's opinion in that case relied heavily on testimony elicited at trial in evaluating the reasonableness of the regulations at issue. 482 U.S., at  91-93. Overton likewise came to this Court on a record made at trial. Overton v. Bazzetta, 539 U.S. 126, 133 (2003). But in this case, the defender of the regulation invites summary judgment. All inferences are to be drawn in favor of the prisoner opposing the regulation, and the question is not which side has the better argument, but whether the Secretary has shown he is entitled to a judgment as a matter of law. By elevating the summary judgment opponent's burden to a height prisoners lacking nimble counsel cannot reach, the plurality effectively tells prison officials they will succeed in cases of this order, and swiftly, while barely trying. It suffices for them to say, in our professional judgment the restriction is warranted. The asserted right to read, see ante, at 2585 - 2586 (STEVENS, J., dissenting), is indeed an "important one," see ante, at 2581 (plurality opinion of BREYER, J.). Even in highest security custody, a constitutional interest of that order merits more than peremptory treatment.

Id. at 554-56 (Ginsburg, J., dissenting).  Justice Ginsburg, thus, articulates a tension created by a want of evidentiary support for either side's summary judgment Turner v. Safley arguments, a tension that is very much present in this case.  Of course, Justice Ginsburg's views did not prevail.  That does not mean that this case is so similar to the summary judgment situation in Beard v. Banks that the counsel of Justices Ginsburg and Stevens does not deserve consideration in this Court's determination of whether or not any of these claims should proceed to trial.

Before addressing the merits of each of the four claims through the prisms of Turner v. Safley and Beard v. Banks, it is worth noting that all four categories of restrictions apply to the general Maine State Prison population across the board.  Multiple times the Beard v. Banks plurality stressed that its determination that the Secretary of the Pennsylvania Department of Corrections was entitled to judgment was based in part on the recognition that this policy was the prison officials' response to a very small subpopulation of "especially difficult prisoners." 548 U.S. at 534; id. at 535 ("The court, for example, offered no apparent deference to the deputy

prison superintendent's professional judgment that the Policy deprived 'particularly difficult' inmates of a last remaining privilege and that doing so created a significant behavioral incentive."); id. at 524-25 ("We here consider whether a Pennsylvania prison policy that 'denies newspapers, magazines, and photographs' to a group of specially dangerous and recalcitrant inmates 'violate[s] the First Amendment.'") (citation to Petitioner's Brief omitted); id. at 525 ("The third such unit, the LTSU, is reserved for the Commonwealth's 'most incorrigible, recalcitrant inmates.' LTSU inmates number about 40.")(citations to Appendix omitted); id. at 530 ("The Secretary in his motion set forth several justifications for the prison's policy, including the need to motivate better behavior on the part of particularly difficult prisoners."); id. ("The statement of undisputed facts says that the LTSU's 40 inmates, about 0.01 percent of the total prison population, constitute the '"worst of the worst,"' those who 'have proven by the history of their behavior in prison, the necessity of holding them in the rigorous regime of confinement' of the LTSU.")(citations to Appendix omitted); id. at 533 ("[P]rison officials have imposed the deprivation at issue only upon those with serious prison-behavior problems (here the 40 most intractable inmates in the Commonwealth).")[10]; but see id. at 542 (Stevens, J, joined by Ginsburg, J., dissenting)( "Thus, it is well settled that even the ' "worst of the worst" ' prisoners retain constitutional protection, specifically including their First Amendment rights. See, e.g.,

---

[10]     Specifically:

Most, but not all, have "flunked out" of the SMU program. To qualify, they must have met one or more of the following conditions: failure to "complete" the SMU program; "assaultive behavior with the intent to cause death or serious bodily injury"; causing injury to other inmates or staff; "engaging in facility disturbance(s)"; belonging to an unauthorized organization or "Security Threat Group"; engaging in criminal activity that "threatens the community"; possessing while in prison "weapons" or "implements of escape"; or having a history of "serious" escape attempts, "exerting negative influence in facility activities," or being a "sexual predator."The LTSU is divided into two levels. All inmates are initially assigned to the most restrictive level, level 2. After 90 days, depending upon an inmate's behavior, an individual may graduate to the less restrictive level 1, although in practice most do not.

Id. at 525-26.

O'Lone v. Estate of Shabazz, 482 U.S. 342, 348n (1987).").  One other consideration here is that rather than "behavior modification" the MSP is invoking the need to, one, limit burdens on staff (thereby tamping down personnel cost) and, two, prevent dangerous or inflammatory information from entering the prison.[11]

### The Claims

It seems that the only way to approach the four claims on the stipulated record before the court is to analyze the proffered logic and counter logic of the two sides, the rather abstract pros and cons of the policies through the prism of Turner v. Safley.[12]   However, the plurality in Beards v. Banks did make it clear that formalistic logic alone may not be sufficient to carry the day for a challenged policy.  Accordingly, I cannot measure these four policies on the basis of the factual record but must weight the merits on the basis of the pro and con logical arguments, with deference to the judgment of the correctional professionals.  See Beauchamp v. Murphy, 37 F.3d 700, 704 (1st Cir. 1994) ("Where burdens are laid upon the exercise of constitutional rights by prisoners, the Supreme Court's current approach is to give very substantial latitude to the state's judgment.  E.g., Turner v. Safley, 482 U.S. 78 (1987); compare Procunier v. Martinez, 416 U.S. 396  (1974).").[13]

---

[11]    See Starr, 2009 WL 224968 at 5 -6.

[12]    In this discussion I have not referred to the deposition testimony that the plaintiffs cite in their memoranda. The Court may want to consider this evidence in determining how to proceed, but the manner in which the plaintiffs have attempted to integrate this evidence into the summary judgment record clearly does not conform with this District's summary judgment practice.  I think that for the court to fairly make evaluative judgments about some of these issues consideration of the testimony would be essential.

[13]    Also relevant to all four counts, is the Supreme Court's reflection in Procunier v. Martinez:

   While the weight of professional opinion seems to be that inmate freedom to correspond with
   outsiders advances rather than retards the goal of rehabilitation, the legitimate governmental
   interest in the order and security of penal institutions justifies the imposition of certain restraints
   on inmate correspondence. Perhaps the most obvious example of justifiable censorship of prisoner
   mail would be refusal to send or deliver letters concerning escaped plans or containing other
   information concerning proposed criminal activity, whether within or without the prison.

**Count I- materials downloaded from the internet**

The above stipulation relates that the MDOC and MSP has barred all prisoners from receiving mail consisting of printed internet materials regardless of content, except for the materials within the specified exceptions.  The defendants' position is:

> Here, the parties agree that there are on-line only materials with legitimate content which prisoners may not be sent under the mail policy and which they may not receive copies of in any other way. However, the plaintiffs give no reason why the same correspondent who is the would-be sender of internet materials may not include the same information in a letter. Although this might be somewhat time-consuming, it pales by comparison to the amount of time it would take staff to review for prohibited content innumerable pages of internet-generated materials sent to a prisoner. Even putting aside the question of the ease of using technology to alter content by imbedding prohibited information in innocent-appearing internet materials, there can be no question that manually slipping a single sheet of prohibited information in with hundreds of innocuous pages is within anyone's capabilities. If caught, the correspondent could then claim that it happened "by mistake," a claim that just could not be made if the person handwrote or typed the prohibited information into a letter (or did the "cut and paste" of internet material into the body of a letter that the plaintiffs make note of).
>
> The plaintiffs' suggestion that the internet materials ban be replaced by either a limit on the number of pages a prisoner may receive in each piece of mail or a limit on the number of pieces of mail a prisoner may receive overlooks the problems that such limits would create. Mailroom staff hardly have the time to count pages or to track how many pieces of mail each prisoner has received in a given time period, and then to notify prisoners whenever a piece of mail has been returned or disposed of because it had too many pages or was the piece of mail that was over the limit.[14] Also, the first limit could be easily overcome by just breaking up the internet materials into separate "packages" and sending them out in numerous envelopes, while the second limit would require all of a particular prisoner's correspondents to coordinate their mailings with one another.

---

Similarly, prison officials may properly refuse to transmit encoded messages. Other less obvious possibilities come to mind, but it is not our purpose to survey the range of circumstances in which particular restrictions on prisoner mail might be warranted by the legitimate demands of prison administration as they exist from time to time in the various kinds of penal institutions found in this country.

416 U.S. 396, 412-13 (1974) (footnotes omitted).

[14]    Here, the defendants cite to Joint Statement of Fact ¶ 42 which reads: "Otherwise, MSP mailroom staff open an envelope without a return address and scan its contents for an address in an attempt to determine where it came from and, if they are able to do so, they return it to that address and so notify the prisoner." (JSMF ¶ 42.)

(Defs.' Opp'n Pls.' Mot. Summ. J. at 6-7.)

In reply, the plaintiffs stress that the defendants admit that there is legitimate content on the internet to which the inmates have no access.  (Pls.' Reply Mem. at 2.)  They also point out that the alternative to this access of transcribing or summarizing, without any graphics, is "impractical."  (Id.)  They propose:

> The MDOC may impose volume limits that would not require mailroom staff to count pages. It could limit pages to those which can reasonably be enclosed in a standard-sized envelope. Or, it could limit such material to a specific number of pages and then have mailroom staff simply "eyeball" the material that comes in to determine if it is over the limit. By visual inspection only, mailroom staff could determine that a stack of pages greatly exceeds, for example, a 20-page limit. As for concerns regarding tracking each prisoner's mail over a period of time, the MDOC can simply impose daily limits. Because the mailroom already segregates all mail by prisoner when it arrives (see JSMF ¶ 52), they can readily determine when an individual prisoner's daily mail exceeds a stated limit. There would be no need to track the volume of a prisoner's mail over time. Furthermore, as long as the specific volume limits are not unduly restrictive, it will not be necessary for a particular prisoner's correspondents to coordinate mailings with one another. If a prisoner does regularly receive too much mail on the same day, he or she could request that those with whom he corresponds spread out their letters so they are not all received at the same time.

(Id. at 3.)[15]

---

[15]   With respect to the dispute between the parties as to what this court can and cannot consider in resolving the present cross motions, the plaintiffs argue:

> Lacking sufficient substantive arguments to support its position, the MDOC further seeks to weaken the Plaintiffs' arguments by objecting to their citation to articles in such newspapers as the New York Times regarding the move of periodicals to the Internet. Again, since the MDOC does not (and cannot) counter Plaintiffs' argument substantively, it seeks to preclude such argument in its entirety. However, the MDOC has cited no rule or case which forecloses a party from citing to a newspaper article in support of its argument.
>
> Finally, the MDOC further challenges the Plaintiffs' arguments regarding the alterability of Internet web pages. In its briefs, Plaintiffs have simply pointed to the well-recognized fact that what the Defendants have asserted is not true. Instead, altering a web page requires specialized knowledge. Such a fact is self-evident to lay persons with any familiarity with the Internet. For example, while reading a newspaper article in NYTimes.com, there is no way to change the content of the article one views on the screen. One would need to access the New York Times secure servers to do so. Since such knowledge and access is not generally available, the MDOC's argument fails in this regard.

(Pls. Reply at 4-5.)

With regards to cases addressing this type of restriction, <u>Clement v. California</u> <u>Department of Corrections</u> analyzed and rejected, after a thorough <u>Turner v. Safley</u> analysis, a similar proscription on internet materials in mail.  220 F.Supp.2d 1098, 1108- 14 (N.D. Cal. 2002), <u>aff'd</u> 364 F.3d 1148 (9th Cir.2004).[16]  It seems to be the available case most directly on point apropos this policy.

The first <u>Turner v. Safley</u> inquiry is whether there is a valid, rational connection between this prohibition on the receipt of most printed internet materials and the defendants' interest put forward to justify it. The MDOC/MSP rationale is that there is a security risk inherent in this category of material and that the MSP cannot devote the human resources to screening this type of information so the prohibition on non-personal printouts is necessary.  In terms of the rationale behind this policy, the plaintiffs point out that there is little evidence that printed internet materials can contain more easily disguised forbidden information than handwritten missives that are unscreened for content.  I note that both parties hypothesize that a correspondent might be willing to go to great lengths to circumvent the intent of this policy and phrase scenarios requiring the inmate giving rather complicated logistical instructions to his correspondents vis-à-vis sending mail or assuming that a correspondent would be willing to hand-copy lengthy objectionable internet postings.  Although this type of subterfuge is the bread and butter of plot lines in the FOX television series *Prison Break*, there is no evidence or representations made as to the MSP's experience of correspondents' attempts to relate or success in relating security compromising information to an inmate through the mail.

---

[16]     <u>See</u> <u>Cole v. Maine Dept. of Corrections</u>, 07-82-B-W, 2008 WL 552768, 4 n.4  (D. Me. 2008).

With regards to this first <u>Turner v. Safley</u> inquiry and the volume control and security justifications for such a ban, <u>Clement v. California Department of Corrections</u> reasoned that there are rehabilitative benefits to allowing prisoners to receive educational reading material and noted that the defendants' in the case justified the ban on mail containing material downloaded from the internet because if it were allowed it would substantially increase the quantity of mail sent to the facility and also Internet-produced material would be more likely to contain coded criminal correspondence because such correspondence could be more easily hidden in such material.  The District Court concluded that defendants had not satisfied the first factor of the <u>Turner</u> test because they did not articulate a rational connection between the policy and the legitimate penological interest.  <u>Clement</u>, 220 F.Supp.2d  at 1110-12.  The Court also noted apropos the evidentiary support for the security concerns: "Defendants have not presented any evidence to support their characterization of the effects of Internet-generated material on prison security.  The absence of evidence, however, is not fatal to Defendants' motion.  The Court's inquiry under <u>Turner</u> is not whether the policy actually serves a penological interest, but rather whether it was rational for prison officials to believe that it would."  <u>Id.</u> at 1110 n.8 (citing <u>Mauro v. Arpaio</u>, 188 F.3d 1054, 1060 (9th Cir.1999)).

With regards to the question of whether there is an alternative means to exercise the right, the plaintiffs explore in their motion memorandum various online sources, highlighting the trend of some major former print publications to go completely on-line, such as the <u>Christian Science Monitor</u> and <u>PC Magazine</u>, the importance of internet blogs which are not accessible by the inmates, and the lack of ability to access on-line photo sharing cites like Shutterfly.  (Pls.' Mot.

Summ.J. at 12-14.)[17]  I have some doubt that having correspondents hand-write the content of an internet posting on an adequately regular basis is "of sufficient utility" to add much "support to the regulations." <u>Overton v. Bazzetta</u>, 539 U.S. at 135.  On this score, <u>Clement</u> reasoned:

> Defendants' reliance on individual transcription is an impractical alternative to transmission of Internet-produced materials. Because Pelican Bay bans all materials downloaded from the Internet, not just e-mail, it is not reasonable to expect individuals interested in transmitting information to prisoners to copy verbatim lengthy articles, judicial decisions, and new procedural rules. With respect to graphics and photos, transcription is impossible. Moreover, summarization of information by laypeople could result in incorrect or improperly interpreted information being transmitted. Consequently, transcription and summarization of Internet-produced material is not a viable alternative to downloading and transmitting this information through the United States mail.

220 F.Supp.2d at 1112.

Third, it is obvious that there will be some impact on prison resources by accommodating this right.  However, almost any policy promulgated by the prison will have some personnel impact and associated cost.  There is very little in the stipulated facts that allows the court to address what specifically the impact on prison resources would be if MSP were to allow receipt of a certain amount of downloaded internet materials.  In other words, one could not say on this record: "Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls." <u>Overton v. Bazzetta</u>, 539 U.S. at 135.

<u>Clement</u>'s take on this prong of the <u>Turner v. Safley</u> analysis is:

---

[17]     On this concern, <u>Clement</u> observed:
Plaintiff has presented undisputed evidence that certain information of particular interest to prisoners is only available on the Internet. For example, a non-profit organization devoted to raising awareness of and preventing sexual violence in prison publishes its information only on the Internet. Other information can be acquired in hard copy only through time-consuming and expensive effort.
220 F.Supp.2d at 1112.

Defendants argue that the increase in the number of pages of mail that
would ensue if prisoners were allowed to receive Internet-generated material
would overload the mail room staff, with a consequent adverse impact on the
allocation of prison resources. However, as noted above, the prohibition at issue
here is an imperfect and arbitrary substitute for regulating quantity of mail.
Whatever impact increased mail volume may have on prison resources cannot
justify Pelican Bay's ban on materials generated from this particular source.

220 F.Supp.2d at 1112.

And as to whether or not there are no alternatives to this aspect of the MSP regulation,

there is no evidentiary support for the defendants' reflection that the mailroom staff could not

handle some sort of page-count/mail-quantity tracking system.  Once again, Clement supports

the plaintiffs' position:

Evidence of an "alternative that fully accommodates the prisoner's rights
at de minimis cost to valid penological interest" is evidence that the regulation is
unreasonable. Turner, 482 U.S. at 91. Defendants have asserted a penological
interest in limiting the overall quantity of mail sent to the prison, but have offered
no evidence that they cannot impose limits on the quantity of mail received by
individual prisoners either through page limitations or limitations on the number
of pieces of mail. For purposes of this motion, the Court assumes that controlling
mail quantity serves a valid penological purpose. A volume control policy would
address Defendants' proffered concern-the increase in the total quantum of mail-
without violating the First Amendment rights of prisoners to receive Internet-
generated information. Consequently, the availability of this alternative policy
suggests the ban on Internet-generated materials is unreasonable.

220 F.Supp.2d at 1112-13.  I also note here that apparently New Hampshire has a policy that

allows inmates to receive ten pages of this category of material.  See Starr, 2009 WL 224968 at

5 n.5 ("Although the prison regulations in effect when Starr's materials were rejected did not

specifically address voluminous Internet printouts, those regulations currently allow inmates to

receive up to ten pages of such materials.").

**Count II -- clippings and/or photocopies from periodicals**

There is a similar dynamic (and many of the same adjudication concerns arise) vis-à-vis Count II, as compared to Count I, and the challenge over the policy applicable to receipt of clippings and/or photographs from periodicals.  It is not clear from this record why this type of material is so patently dangerous that there has to be a comprehensive ban.  As with the ban on all internet materials, it is not clear on this record how the MDOC and MSP have balanced the inmates' First Amendment rights with the institutional safety concerns.  Personnel burden again seems to be a major impetus behind the ban, along with the concern of some dangerous content slipping through.

The defendants argue:

> The plaintiffs … downplay the burden on staff resources of permitting clippings and photocopies from periodicals. The plaintiffs contend that clippings are far easier to review than entire periodicals. This contention, however, is based on the false premise of "either or." Lifting the ban on periodical clippings and photocopies would not mean that staff would be reviewing clippings and photocopies instead of entire periodicals; it means prison staff would be reviewing them in addition to entire periodicals. Similarly, the assertion that articles already prohibited under the "media review" process could be quickly identified if sent through the mail overlooks that it is not the mailroom staff who does the media review of periodicals (see JSMF ¶ 31) and also overlooks that such articles might be sent years after the "media review" process or that articles with prohibited content might be from periodicals that are not subscribed to by prisoners, and, therefore, never went through "media review" at all.

(Defs.' Opp'n Pls.' Mot. Summ. J. at 5.)   The defendants rely on the joint statement of fact that includes the statement that a prisoner may access an article of interest in another periodical by availing themselves of the inter-library loan process.  (Id. at 4.)  The defendants insist that the correspondent who would have sent a clipping or photocopy could instead send a letter with the information necessary for making the intra-library loan request.  (Id. at 4-5.)

The plaintiffs reply that an inmate's access to periodicals is necessarily limited to those available at MSP or through inter-library loan and they fault the defendants for not presenting any evidence of what precisely is the range of materials that is in fact available through this request process.  (Pls.' Reply at 1-2.)  The plaintiffs insist that these clippings or copies are easily reviewed for content and that if volume control is the issue then there is no problem limiting the quantity of articles in each envelope, whether or not the mailroom staff has the experience of media review of full periodicals.  (Id. at 2.)

The defendants take particular issue on this question in their reply to the plaintiffs' opposition to their motion for summary judgment:

> The plaintiffs assert that reviewing periodical clippings for prohibited content would require less time and effort than the present process of reviewing them for permitted content under the exception for material that primarily discusses religious, legal or political subject matter. This is a bald assertion, based on a stated assumption, but one without any support in the record, that it is easier to identify prohibited content than to identify permitted content, as well as on an unstated and equally unfounded assumption that the number of clippings that would be reviewed would be the same either way.
>
> However, to the contrary, it is explicitly stated in the joint statement of material facts that since the ban in question, there have been sent in much smaller numbers of periodical clippings, most of which consist of announcements of significant family events (another exception to the ban, which, if anything, does consist of readily identifiable permitted content). *See* JSMF, ¶ 36. Adding to a process of reviewing periodical articles for prohibited content a limit on volume might lessen the time and effort needed to review clippings but would just substitute other resource-draining problems, along the same lines as those discussed by the defendants in their opposition to the similar suggestion made by the plaintiffs about the internet materials ban. Clearly, then, it is the present process that avoids an undue burden on staff resources, not the one to which the plaintiffs urge a return and which has already proven unworkable. *See* JSMF, ¶¶ 36, 60.

(Defs.' Reply at 1-2) (footnote omitted).  In a footnote the defendants insist:  "The plaintiffs' suggestion that there be a requirement that the name of the periodical and title of the article be easily identified on the clipping might help in a few cases, but there is no reason to believe that

most articles with prohibited content can be identified just by their source and title."  (Id. at 1

n.1.)

      With respect to the four Turner v. Safley factors, this claim is so related to the claim

challenging the ban on internet materials that there is little purpose in going through each one

independently here.  Rather, there are two Circuit Court of Appeals cases that offer thorough

Turner v. Safley analysis of similar prohibitions on the receipt of clippings and photocopies from

correspondents.[18]

      The Second Circuit addressed such a policy in Allen v. Coughlin, explaining that a rule

that permitted the sending of clippings only from a publisher was "tantamount to a complete

prohibition."  64 F.3d 77, 80 (2d Cir. 1995).[19]  Relying on affidavits, the correctional defendants,

> justified the publishers-only rule for news clippings as rationally related to
> preventing the dissemination of inflammatory material that might threaten the
> order and security of the prison. The affidavits asserted that prison security would
> be threatened by news clippings pertaining, for example, to child pornography or
> the assembly of bombs. The affidavit of one prison official thus stated that the
> clippings "pose even greater problems than newspapers in connection with
> inspection and review because their source is not readily apparent." However, the
> affiants cited only one concrete example of a dangerous clipping-a fake article
> about an inmate's gang involvement.

Id.  "The affidavits," the panel explained, fell "short of establishing the claimed danger from

newspaper clippings." Id. The Court reasoned:

> Newspapers received directly from publishers and ordinary correspondence may
> also contain inflammatory material. The record indicates that DOCS officials do
> not generally read prisoners' incoming correspondence absent some reason to

---

[18]     Both parties complain about the lack of the concrete evidence in support of the other side's position.  This is
the problem with the record that I have highlighted. For now the resolution of the summary judgment dispute must
be based on the arguments and speculation made in the memorandum and in the stipulated facts.  This is one of the
reasons why the treatment of this claim in this recommended decision is more dependent on its similarities with
comparable policies addressed in other cases than with hashing through each Turner v. Safley prong for factors and
evidentiary support unique to this case.

[19]     The Second Circuit used a three-prong analysis drawn from  Thornburgh v. Abbott, 490 U.S. 401 (1989),
addressing the first three Turner v. Safley inquiries, and not addressing whether or not there are ready alternatives
for the correctional defendant to further the interest behind the policy. See id. at 79 -80.

believe that particular correspondence threatens the order or security of the prison. Instead, they open it and shake it to see if there is contraband. Indeed, ordinary correspondence may contain summaries of newspaper articles. The only distinction offered by [the correctional defendants] between ordinary correspondence and news clippings is that a news clipping may have more veracity than correspondence and thus a greater capacity for causing disruption. This may be true in some limited circumstances but it does not establish that news clippings are as a matter of law so much more threatening to prison security than ordinary correspondence that clippings should be essentially prohibited while correspondence goes largely unread.

Id.

      With respect to the second <u>Turner v. Safley</u> factor, the Second Circuit rejected the

District Court's conclusion that the record demonstrated that there were effective alternatives to

receive the clipped newspaper articles through interlibrary loans or subscriptions.  <u>Id.</u>  The Panel

explained:

Subscriptions are not entirely substitutable for clippings because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers. Subscriptions also require the expenditure of personal wealth in circumstances in which the ability to pay may be the exception rather than the rule. With regard to interlibrary loans, the affidavit of the DOCS supervising librarian stated only that a request for such a loan can be made but not that it will necessarily be honored. Moreover, a request for an interlibrary loan requires that the inmate know the particular paper and date of articles of interest.

Id.

      As for the cost-of-accommodation prong of the analysis, the <u>Allen v. Coughlin</u> Court

stated:

      The district court found, on the third prong of <u>Thornburgh</u>, that a policy accommodating Allen "would require prison staff to read each article that comes through the mail and would impose a particularly onerous burden on the prison staff." However, appellees' showing on this point does not justify summary judgment. Clippings are far easier to examine for content than entire newspapers. Indeed, the stated justification for the publishers-only rule with regard to newspapers is that their bulk makes them difficult to inspect for content or concealed contraband. Clippings are far easier to inspect, and DOCS is certainly free to define permissible clippings-for example, by number of pages-in a way

36

that prevents evasion of the publishers-only rule for newspapers. The degree to which the cost of such review is burdensome is an issue of fact not resolved by the conclusory affidavits submitted. We thus cannot say as a matter of law that a change in official policy would precipitate an avalanche of newspaper clippings at the prison.

Id. at 80-81.

Following Allen, the Seventh Circuit Court of Appeals addressed this species of policy in

Lindell v. Frank, an opinion authored by Judge Wood:

Here, Lindell challenges the way that officials at WSPF interpreted the DOC's general publications policy, which merely states that "[i]nmates may only receive publications directly from the publisher or other recognized commercial sources in their packages," see Wis. Admin. Code DOC 309.05(2)(a). The question before us is a narrow one. It does not implicate the constitutionality of the DOC's publishers' only rule; rather, it concerns the question whether Lindell's right to receive and exchange information was violated by WSPF's application of that general policy to publication clippings and photocopies of clippings.

WSPF's rule satisfies the first Turner factor. The defendants' security interest in screening for hidden messages and their economic interest in saving staff resources are both legitimate. Although the district court held otherwise, there is a rational connection between these interests and a policy that lowers the overall number of mailed items that require screening.

But the remaining Turner factors, which relate to whether the anti-clipping or anti-copy policy is a reasonable solution to the stated security problem, weigh against the defendants. First, Lindell did not have an alternative means of exercising his rights. As the district court noted, Lindell had been in WSPF's most restrictive housing level, level one, and he did not have access to the prison library's limited supply of publications. And even if he had access to the prison's material or paid for his own subscriptions, subscriptions are not fully equivalent to clippings "because subscribing requires inmates to anticipate which papers might have articles that they like to read and to subscribe to all such papers." Allen, 64 F.3d at 80. Second, the defendants could accommodate Lindell's rights without a large burden on staff. As the district court noted, the defendants are already screening personal mail, which could just as easily contain hidden messages. It appears that the problem is not clippings exclusively; it is the overall volume of mail that could potentially contain hidden messages. This overall volume could be addressed by limiting the number of clippings that can be sent to an inmate. Additionally, the prison could allow only photocopies of clippings rather than the clippings themselves, so that prison staff are screening more manageable material. See Lake v. Borgen, No. 03-C-372-S, slip opinion at 6 (W.D.Wis. Jan. 15, 2004) (holding that prison rule that banned receipt of publication clippings from noncommercial sources was constitutional when prison

allowed inmate to receive photocopies of clippings as an alternative means of exercising his right).

Although it is a close issue because of the deference prison administrators enjoy in these cases, see Thornburgh v. Abbott, 490 U.S. 401, 407 (1989), in light of Lindell's lack of other access to the restricted materials and the less exaggerated responses available to the prison, we agree with the Second Circuit's decision in Allen and with the district court that WSPF's ban as currently applied to all clippings and copies violated Lindell's First Amendment rights.

377 F.3d 655, 659 -60 (7th Cir. 2004).[20]

Of some import, the Seventh Circuit's Jackson v. Frank, came out on the other side of a similar dispute over a clippings prohibition. 509 F.3d 389, 392 (7th Cit. 2007) (Evans, J.). There, the Panel acknowledged Lindell: "We previously have suggested that the prison could reduce its volume of mail by limiting the number of materials that an inmate is allowed to receive, rather than implementing an outright ban on particular content." Id. (citing Lindell, 377 F.3d at 660). "But" the Jackson Panel continued, "a regulation does not need to satisfy a 'least restrictive alternative test.' Turner, 482 U.S. at 90-91; Al-Alamin v. Gramley, 926 F.2d 680, 685 (7th Cir.1991). Here, Jackson has put forward no evidence of the supposed cost savings of capping the volume of mail that inmates may receive compared to the benefits of banning individual, commercial photographs." Id. In a footnote the Panel questioned, "If possessing a photo of a movie star in a prison cell can even be deemed a 'right' protected by the First Amendment." Id. at 392 n.3.[21]

Given the available legal precedents and the paucity of fact-specific evidence available to the court from either side, my conclusion here is that if the court views the available evidence in

---

[20]     The District Court in Lindell relied heavily on Clement in reaching its conclusion that the clipping policy was unconstitutional.  See Lindell v. Frank, No. 02-C-21-C, 2003 WL 23198509, 15 -17 (W.D.Wis. May 5, 2003).
[21]     The star in question was Jennifer Aniston.

the light most favorable to the non-movant on either of the cross-motions, the result is neither party is entitled to judgment as a matter of law.

**Count III --commercial catalogs**

Viscerally, it is hard not to just outright accept the reason behind the MDOC's and MSP's ban on commercial catalogs given the average household's experience with the continuing onslaught of catalogs that seem to multiply like rabbits in the mail box.  Nevertheless, a <u>Turner v. Safley</u> analysis is required.  <u>See</u> <u>Jones v. Salt Lake County</u>, 503 F.3d 1147, 1159 -60 (10th Cir. 2007).[22]

First, with regards to the question of whether or not there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it, the defendants insist that prior to the ban almost all prisoners would subscribe to the many free catalogs available and, as a result, "hundreds and hundreds of pounds of catalogs came in, requiring a great deal of staff time to sort and deliver them."[23]  Since the ban, MSP staff has been able to handle the catalogs that are received, most of which are for religious items.  And when prisoners are transferred or released the policy required forwarding.  Creating an even greater burden on staff was the inability to get the companies sending the catalogs to stop doing so after a prisoner's release, to the point that catalogs often came in for years after a prisoner's release.

---

[22]	There are a few cases in the Tenth Circuit that have stated that the denial of commercial catalogs simply does not implicate the First Amendment.  <u>See</u> <u>Smith v. Maschner</u>, 899 F.2d 940, 944 (10th Cir. 1990); <u>Berger v. White</u>, No. 00-1413, 12 Fed.Appx. 768, 771, 2001 WL 433383, 1 (10th Cir. Apr. 27, 2001) (unpublished); <u>Foster v. Nelson</u>, No. 98-3069.153 F.3d 727, 1998 WL 422030, 1 (10th Cr. July 23, 1998)(unpublished).  However, the Tenth Circuit pointed out in <u>Jones v. Salt Lake County</u>, none of these cases "involved a challenge to a prison regulation and none applied <u>Turner</u>.  Rather, these cases were limited to a prison official's one-time failure to deliver catalogs to an inmate.  Here, …[the plaintiff has challenged] the constitutionality of its mail regulations. Thus, these cases do not control and a <u>Turner</u> analysis is necessary."  503 F.3d at 1159 -60.
[23]	Of course this is not stated in the policy itself so it is one of those assertions the defendants are asking the court to take at face value.

In <u>Prison Legal News v. Lehman</u> four penological goals were forwarded to justify a ban on non-subscription bulk mail and catalogs, one of which was "reducing the amount of mail coming into the jail generally in order to reduce the amount of work required to sort the mail and deliver it to inmates." 397 F.3d 692, 699 (9th Cir. 2005). The Ninth Circuit Panel addressed the DOC's argument "that the regulation is justified because it reduces the volume of mail generally," explaining: "Our previous cases analyzing the efficient use of staff time argument also apply here. While the DOC's mailroom staff may have to spend more time analyzing the content of non-subscription bulk rate mail and catalogs, such a ban on non-subscription bulk rate mail and catalogs is not rationally related to the goal of reducing contraband." <u>Id.</u> at 700. The claims in that case were brought by the publisher of the potential catalogs and not the inmates.

With respect to the assertion by a prisoner of the right to receive catalogs, <u>Jones v. Salt Lake County</u> addressed a ban on commercial catalogs. 503 F.3d at 1159 -60. There the Panel noted that the class-action plaintiff had probably not met his <u>Turner v. Safley</u> burden but remanded because the District Court had not analyzed the claim pursuant to <u>Turner v. Safley</u>'s four prongs. With respect to this first inquiry, the Tenth Circuit noted: "Space, health and safety' are legitimate and neutral penological interests and the catalog ban is rationally related to those interests-these factors weigh in favor of the constitutionality of the ban." <u>Id.</u> (footnote omitted).[24]

The District Court in <u>Kalasho v. Kapture</u>, 868 F. Supp. 882 (E.D.Mich.1994) addressed a bulk mail ban comprehending catalogs, and found it survived <u>Turner v. Safley</u> scrutiny. As to the first prong, it explained

---

[24]    The Court noted that the defendants "did not elaborate on the meaning of 'space, health and safety,'" noting that there was an affidavit expounding on the jail's justifications for the catalog ban but that the affidavit was not included in the appellate record so the panel declined in consider it. <u>Id.</u> at 1160 n.15. I am unable to locate any records of activity in this case in the District Court since, perhaps because there seems to have been several cases consolidated and judge reassignments.

Defendant states in his supplemental brief that allowing all third class/bulk rate mail could create a tremendous influx of incoming prisoner mail. Such an influx of incoming mail poses the possibility of a serious security threat to the institution. Third class/bulk rate mail typically results in a tremendous amount of mail, thereby presenting the problem to prison officials of insuring that contraband is not smuggled into the prison via the vast amount of third class mail.

In addition to the problem of insuring that each piece of bulk mail does not contain contraband, fire hazard and accumulation of excess property is of continuing concern to prison officials. Any accumulated combustible material in the finite space accorded inmates is an obvious fire hazard and a concern to the safety and security of other inmates, officials, and the institution. Further, accumulated third class/bulk rate mail poses a security problem such that prisoners could conceivably secret contraband materials amongst it, and make cell searches more difficult. This again has implications for the safety of all inmates, officials, and the institution.

It is clear to this Court that the allowance of third class/bulk rate mail to inmates poses legitimate security concerns. The language of policy directive 63.03(N) makes it explicitly clear that third rate/bulk class mail is being restricted because the Department of Corrections considers it to be a threat to the order and security of the institution or to the rehabilitation of the prisoner. *See* PD-BCF-63.03(N). Protecting prison security is a purpose central to all other correction goals. Thornburgh v. Abbott, 490 U.S. 401, 413-16 (1989). As a consequence, the regulation's goal is legitimate, as it relates to legitimate security concerns.

Id. at  887 (record citations omitted); see also Sheets v. Moore, 97 F.3d 164, 168 (6th Cir. 1996)

("It is clear to this Court that the allowance of third class/bulk rate mail to inmates poses

legitimate security concerns.  The language of policy directive 63.03(N) makes it explicitly clear

that third rate/bulk class mail is being restricted because the Department of Corrections considers

it to be a threat to the order and security of the institution or to the rehabilitation of the prisoner.

See PD-BCF-63.03(N).  Protecting prison security is a purpose central to all other correction

goals.  Thornburgh v. Abbott, 490 U.S. 401, 413-16 (1989).  As a consequence, the regulation's

goal is legitimate, as it relates to legitimate security concerns.")(following Kalasho v. Kapture,

868 F.Supp. 882 (E.D.Mich.1994)); but see Sherman v. Kapture, No. 96-2445, 142 F.3d 436,

1998 WL 109994, 2 (6th Cir. Mar. 3, 1998) ("Relying primarily on the rationale enunciated in

Kalasho v. Kapture, 868 F.Supp. 882 (E.D.Mich.1994), the court in Sheets ruled that: (1) PD-

05.03.118(N)(8) is a neutral means toward effecting MDOC's legitimate objective of limiting a potentially overwhelming influx of mail to prisoners[.]") (not mentioning the security issues).[25]

However, the MDOC and the MSP has not advanced security or any space, health and safety concerns as the reason behind this policy and it is undisputed that the volume of mail a prisoner is allowed to keep in his cell at any given time is restricted, both to keep down the quantity of burnable, combustible material and to keep down the amount of time staff have to spend to do a thorough search of the contents of a cell for contraband.  (JSMF ¶ 13.)

The Ninth Circuit's Morrison v. Hall addressed a policy that provided: "'Mail shall be required to be sent by first or second class postage. Bulk rate, third and fourth class mail is prohibited.'"  261 F.3d 896, 900 (9th Cir. 2001). The fourth of four justifications for this policy "was facilitating the efficient use of prison personnel and prison resources."  Id. at 902. Following Prison Legal News v. Cook, 238 F.3d 1145 (9th Cir. 2001), Morrison v. Hall explained:

> Prison Legal News rejected the argument that a prohibition on bulk rate, third, and fourth class mail is legitimate because it facilitates the efficient use of prison resources. Id.  [at 1151.]As we explained:
>> The [defendants] assert that the ban on standard mail allows mailroom staff to concentrate its efforts on timely processing acceptable mail and thoroughly inspecting such mail for content and contraband. Publisher and Prisoners respond that processing subscription non-profit organization standard mail would not substantially deplete prison resources and would not add significantly to the mailroom staff's workload. We agree. The reality is that all incoming mail must be sorted. The record shows that distinguishing between non-profit organization standard mail and regular/commercial standard mail is not unduly cumbersome, particularly

---

[25]     Although not actually addressing the same prohibition on catalogs, in Jacklovich v. Simmons the Tenth Circuit analyzed a "$30 monthly limit on publications, [a] ban on gift publications, and [a] ban on Level I inmates obtaining publications altogether.  392 F.3d 420, 426 (10th Cir. 2004). It is worthy of note that the Tenth Circuit reversed the grant of summary judgment for the correctional defendants concluding that there were genuine disputes of material facts on all of the four Turner v. Safley factors and that the case could not be resolved at the summary judgment phase as a matter of law on the basis of similar cases.  Id. at 427-28.  In  Jacklovich the rationale for the policy pertained to behavior management and a dissuasion of strong-arming between inmates.  Id. at 429-31.

in light of the relatively insignificant amount of incoming non-profit
organization standard mail received at the Department's several facilities.
Id. Thus, we held that the "efficient use of staff time" argument cannot justify an
effective ban on non-profit subscription publications. Id.

In this case, the defendants have failed to submit any evidence regarding
the quantum of for-profit subscription publications received at the Oregon
prisons….

…

At oral argument, counsel for the defendants acknowledged that at its
core, OAR 291-131-025(6) is a convenient way for the OSP to limit the total
quantum of mail that enters the state prison system. As counsel stated at oral
argument, "it's a volume consideration." But prohibiting inmates from receiving
mail based on the postage rate at which the mail was sent is an arbitrary means of
achieving the goal of volume control.

For the forgoing reasons, with respect to the first Turner factor, we find
that the defendants have failed to demonstrate that the OSP regulation banning
incoming mail based on postage rate "is rationally related to a legitimate and
neutral governmental objective." We are not persuaded that there is any legally
significant distinction between the subscription non-profit publications at issue in
Prison Legal News, and the subscription for-profit publications at issue in this
case. We therefore find as a matter of law that as applied to pre-paid, for-profit,
subscription publications, OAR 291-131-025(6) is not rationally related to a
legitimate penological objective.

As in Prison Legal News, because "the rational relationship factor is the
sine qua non," our finding that the first Turner factor favors Morrison is sufficient
to reverse the district court's grant of summary judgment in favor of the
defendants on the constitutionality of OAR 291-131-025(6). Prison Legal News,
238 F.3d at 1151 (emphasis added).

Id. at 903 -04.

More recently, the District Court of New Hampshire, addressing a particular incident of a

denial of internet downloads of statutory type information to an inmate, was willing to embrace

as "plainly legitimate," along with other penological concerns, "the State's interest in limiting the

amount of staff resources that must be devoted to reviewing incoming inmate mail." Starr, 2009

WL 224968 at 5.[26]

---

[26] The Court relied on Jackson v. Frank, 509 F.3d 389, discussed above with respect to the clippings policy claim.

With regards to the issue of whether or not there is an alternative means to exercise this right, the MDOC and the MSP assert that a selection of catalogs containing items that prisoners may order is available in the library. In the opposition memorandum the defendants press the complaint by inmates "that they have no means to access commercial catalogs not maintained in the prison library goes too far. ..[P]risoners are not entitled to access every bit of information available to persons in the community."  (Defs.' Opp'n Pls.' Mot. Summ.J. at 3.)

Apropos the drain on prison resources if a right to receive catalogs in the mail was recognized, there is little doubt that there would be a significant increase in incoming mail.  The defendants have not attempted to quantify that potential resource drain, but they do indicate the problems encountered before the ban went into effect.  Their solution does not ban prisoners from access to all catalogs, but simply sets limits that are reasonable and accord with orderly administration of the prison.  Because they do allow access to catalogs under the exceptions and through the prison library, there is no arbitrary ban on access to all commercial catalogs and, thus, this policy is unlike other prison policies that have been found to be problematical.

With regards to the question of whether or not there is an alternative to this policy approach, the defendants maintain that the plaintiffs' proposal that the MSP limit the number of catalogs that each prisoner is permitted to subscribe to would mean that mailroom staff would have to keep a list of each catalog each prisoner gets, including periodic revisions, and to check the catalogs against the list.  This list-keeping necessity does not, in and of itself, mean that this is not an alternative under <u>Turner v. Safley</u>; presumably there would be few alternatives to a prison's adopted, and, thus, favored routine, that would not be in some way less satisfying to the institution.  On the other hand, the prison is not required to adopt the least restrictive alternative when considering what sort of access to allow.  In this case the summary judgment record does

clearly establish that prisoners do have access to some mail order catalogs, both for profit and nonprofit, through both through the prison library mechanism and through the religious/legal exceptions.  In my view the defendants have presented a record which entitles them to judgment as a matter of law on this count.

**Count IV -- return address requirement**

Finally, the fourth MSP mail policy challenged by the plaintiffs is the policy governing any incoming general mail without a verifiable return address.

Regarding the connection between the return address regulation and the government interest put forward to justify it, the MDOC considers it "well known" that mail without a verifiable return address is more likely to contain substances and/or information that jeopardize safety, security, and orderly management, such as anthrax, drugs, and information related to criminal activity.  This is the main concern stressed in the defendants' memorandum opposing the plaintiffs' motion.  (See Defs.' Opp'n Pls.' Mot. Summ. J. at 7.)  The defendants also assert that the insistence on a return address allows for tracking of correspondents who pose a risk to prison security.  The defendants point out that the plaintiffs are not contesting the validity of the goal of allowing mail to be returned to the sender after the inmates release or transfer.  (Defs.' Opp'n Pls.' Mot. Summ. J. at 7.)   With regards to the plaintiffs' assertion that correspondents can simply use fake return addresses to circumvent the policy, the defendants urge: "Just because there is a way around a restriction does not mean the restriction should be done away with, especially if not everyone takes that way around it."  (Id. at 8.)

For their part, the plaintiffs spend very little effort trying to make their case for this claim in their motion for summary judgment.  (Pls.' Mot. Summ. J. at 19-20.)  They seem to credit that, as to mail without a return address, there is more a risk of contraband and that it cannot be

returned.  (Id.)  Their main objection is that part of the MDOC's and MSP's justification is

illusory because the MSP does not verify the addresses of correspondents when a return address

is given.  (Id. at 20.)

The defendants are right that Morrison v. Hall, 261 F.3d 896 (9th Cir. 2001) supports

their defense of the first Turner v. Safley requirement:

> With respect to the first Turner factor, the defendants offer two legitimate
> penological interests supporting this requirement: (1) that the complete name and
> return address facilitates the return of mail to the sender if necessary, and allows
> the prison to inform the sender of prison mail requirements; and (2) that the
> complete name and return address assists the OSP in investigations.
>
> > This second reason alone provides a sufficient justification for the rule.
> The defendants submitted sufficient evidence to demonstrate that "[a] return
> address is an invaluable and necessary tool in gathering intelligence and
> conducting investigations." As the declaration of Brad Halverson, the Manager of
> the Drug Investigation Unit, states:
>
> > > The return address is an integral part of the package of information
> > > we rely on when conducting investigations: inmate mail, inmate telephone
> > > conversations and activity on inmate trust accounts. Our ability to
> > > investigate would be drastically affected without it. An influx of
> > > controlled substances into [Oregon Department of Corrections] institutions
> > > is a likely outcome of not requiring incoming inmate mail to bear a return
> > > address. Increased drug usage and trafficking obviously threatens the good
> > > order, safety and security of [the] institutions.
> >
> > Because maintaining security is a legitimate penological interest, Procunier, 416
> > U.S. at 412, we find that the first Turner factor favors the defendants.
> > Furthermore, because the regulation passes muster under the first Turner factor,
> > and first factor is the sine qua non of the Turner test, we need not consider the
> > remaining factors. Prison Legal News, 238 F.3d at 1151.
> >
> > > In sum, because the defendants submitted sufficient evidence to
> > demonstrate a rational connection between requiring that all incoming mail
> > include the sender's complete name and address and the goal of facilitating
> > investigations, which in turn enhances prison security, we affirm the district
> > court's grant of summary judgment to the defendants on this issue.

261 F.3d at 907.[27]

---

[27]     Unlike in Morrison, the plaintiffs here have not introduced argument or evidence that correspondents are
deterred from sending inmates mail because of the requirement that they disclose their name and address on the face
of the envelope.

The three remaining <u>Turner v. Safley</u> factors require little discussion.  As for the question of whether or not there is an alternative means to exercise the right, the only way around the requirement for the inmates would be for the communication to occur through telephone conversations or visits.  Answering the question of what the impact that accommodating the right will have on prison resources is rather circular.  The chief reason for the restriction – concern of hazardous substances or contraband in unmarked envelopes – would, presumably, be the impact of allowing mail to be sent without a return address as a matter of course.  That the prison would not be able to forward mail would be more a detriment to the transferred or released prisoner rather than the prison that could just dispose of the mail.  Likewise, the concern of whether there are alternatives to the prison regulation does not open up much room for exploration.  The prison already has implemented a policy of examining the contents of this type of mail to try to ascertain the sender's identity and, unless there is a reason for further security measures, returns the mail to the sender and notifies the inmate.  Accordingly, the correspondent is given the opportunity to resend the mail in conformity with the return address requirement.  The bottom line with this claim is that the plaintiffs have not sufficiently met the <u>Turner v. Safley</u> burden as to this claim.

### *Recommended Disposition of Counts I and II*

With regards to the remaining claims -- Counts I and II, pertaining to internet downloads and periodical and news clippings -- I am forced to make a tough call about the viability of the claims in light of the summary judgment record.  As stated earlier, <u>Overton v. Bazetta</u> emphasized that a court must ask whether or not "[p]rison administrators had reasonably exercised their judgment as to the appropriate means of furthering penological goals."  539 U.S. at 133.  The Supreme Court also stressed that the burden "is not on the State to prove the validity

of prison regulations but on the prisoner to disprove it." Id. (citing Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. at 128 (1977), O'Lone v. Estate of Shabazz, 482 U.S. at 350, and Shaw v. Murphy, 532 U.S. 223 (2001)).  The plurality opinion in Beard v. Banks suggests that a correctional defendant, while not able to rely on logic alone, may through an undisputed statement of fact and deposition "bring the Policy within Turner's legitimating scope." 548 U.S. at 533; see id. at 535-36.

However, the manner in which the parties have presented the case to this Court is more, at least initially, in the spirit but not in the form of a submission for judgment by the court on a stipulated record.  The form is undoubtedly cross motions for summary judgment and this is a difference of some significance.  See Boston Five Cents Savings Bank., 768 F.2d at 11 -12 ("[G]iven the pressure of a heavy case load and the consequent need for judicial efficiency, it may be desirable for district courts specifically to draw counsel's attention in an appropriate case to the limitations of the 'cross-motions for summary judgment' procedure.  In sum, we conclude that the grant of summary judgment was improper.  On remand, the parties may submit additional evidence.  The district court, in deciding the case, should again consider all the issues and arguments in light of the record created."); see also Sullivan v. City of Augusta, 511 F.3d 16, 21 (1st Cir. 2007). What is more, in this case the plaintiffs made it clear that they stipulated to statements with the understanding that they could still contest the factual basis for the policy justifications by referring to deposition testimony.  That testimony needs to be before the court in order for the court to properly determine which party is entitled to judgment.

The key, policy-justifying 'because' statements of fact are easily identified.  As for the internet materials:

48

The policy prohibits prisoners from receiving materials downloaded from the internet through the mail (with the exceptions set forth in Procedure A.17) <u>because</u> prior to the ban the prisons had been receiving increasingly large amounts of materials downloaded from the internet due to the ease of printing off hundreds of pages. It would have taken staff a great deal of time to screen the materials to determine whether or not they contained prohibited information, including such things as instructions on how to circumvent security devices and how to make weapons. Additionally, without reading each page, it would not have been possible to determine if otherwise innocent appearing materials had been altered by imbedding prohibited information. The MDOC considers that correspondence is less likely to contain prohibited information <u>because</u> the writer would be unable to claim the prohibited information was included "by mistake." Since the ban, the mailroom staff have been able to screen the much smaller amounts of downloaded materials sent in, most of which consists of materials discussing religious subject matter.

(JSMF ¶ 29) (emphasis added).  As for the clipping and photograph policy:

The policy prohibits prisoners from receiving such an article through the mail (with the exceptions set forth in Procedure A.16) <u>because</u> prior to the ban prisoners had been attempting to circumvent the "media review" process by having articles not meeting the guidelines of Procedure E.1. clipped or photocopied and sent in through the mail. It would have taken a great deal of staff time to review every article sent in to see if it had prohibited content. Since the ban, the mailroom staff have been able to screen the much smaller numbers of clippings and photocopies sent in, most of which consist of announcements of significant family events.

(<u>Id.</u> ¶ 36) (emphasis added).

The defendants also provided the following justification applicable to all three of these

contested bans (internet, clippings and catalogs):

Policy 21.2 was written as part of the transition to the new Maine State Prison. This policy was written, partially, to cope with the increasing problems set out in paragraphs 29, 36, and 38, which were exacerbated by the quick doubling of the prisoner population in the new Prison compared to the old Prison with no increase in mailroom staff. On August 4, 2003 when Policy 21.2 first went into effect, the bans on internet downloads, materials clipped and/or photocopied from periodicals, and catalogs were implemented as total bans. The religious, legal, and political exceptions originated with a challenge to the policy in a Maine court case, and were written into the policy when it was revised on June 21, 2004, even though the Maine case had been dismissed on technical grounds a month earlier. The MDOC considered that the religious exception would allay concerns arising

> out of RLUIPA (the Religious Land Use and Institutionalized Persons Act), the legal exception would ensure that prisoners could be mailed materials relating to their criminal cases, and the political exception reflected the fact that Maine is one of only two states allowing prisoners to vote. As well, the exception to the clipping and photocopying ban for announcements of significant family events was added due to prisoner expression that these materials were of special importance.

(Id. ¶ 60.)  While the plaintiffs may not intend to challenge the facts describing, for example, the daily routine of the mail room staff, they have made it clear that they do challenge the facts material to these justifications.  The problem is that this court does not have record evidence supporting or controverting all of these key justifying paragraphs.

Unless the Court is persuaded that the defendants are entitled to summary judgment on these two counts under Turner v. Safley and Beard v. Banks, I recommend that the Court deny both motions on Counts I and II and give the parties the opportunity to submit the matter on a stipulated record, if they can reach an agreement to do so, or this matter would presumably proceed to trial.  I do recommend the court grant the defendants' motion as to Counts III and IV and I also recommend that Shanholtzer and Anderson have judgment entered in their favor as to all counts.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

March 5, 2009                              /s/ Margaret J. Kravchuk
                                           U.S. Magistrate Judge